# EXHIBIT "C"

FILED BY FAX

1

2 GUTRIDE SAFIER LLP

Adam J. Gutride (State Bar No. 181446)
3    adam@gutridesafier.com
Seth A. Safier (State Bar No. 197427)
4    seth@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
5    todd@gutridesafier.com
100 Pine Street, Suite 1250
6 San Francisco, California 94111
Telephone: (415) 789-6390
7 Facsimile: (415) 449-6469

8 Attorneys for Plaintiffs

**FILED**

San Francisco County Superior Court

AUG 15 2018

CLERK OF THE COURT
BY: _____
Deputy Clerk

9          SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                   COUNTY OF SAN FRANCISCO

11

12 | RICHARD GONZALES and
MATTHEW WALKER, on behalf
13 | of themselves, the general public,
and those similarly situated,

14                     Plaintiffs,

15          v.

16
TP-LINK USA CORPORATION;
17 | and TP-LINK NORTH AMERICA
INC.,

18                     Defendants.

19

20

Case No. **CGC-18-568950**

Unlimited Civil Case

Class Action Complaint for Fraud,
Deceit, and/or Misrepresentation;
Breach of Contract; Violation of the
Consumer Legal Remedies Act; False
Advertising; Negligent
Misrepresentation; Unjust Enrichment;
and Unfair, Unlawful, and/or Deceptive
Trade Practices.

Jury Trial Demanded

21

22

23

24

25

26

Richard Gonzales and Matthew Walker, by and through their counsel, bring this Class Action Complaint against Defendants, on behalf of themselves, and those similarly situated, for fraud, deceit, and/or misrepresentation; violation of the Consumer Legal Remedies Act; false advertising; negligent misrepresentation; unjust enrichment; and unfair, unlawful, and/or deceptive trade practices. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

### Introduction

1.   This case concerns wireless routers that TP-Link markets and sells as conforming with the IEEE 802.11n and/or IEEE 802.11ac wireless standards. TP-Link specifically markets, advertises and represents to consumers that these routers (hereinafter referred to as the "Purported 802.11 Routers") offer wireless connections and particular speeds. For example, TP-Link represents that the router Mr. Gonzales purchased offers a connection of 1,300 megabits per second over the 5 GHz band, as well as a connection of 450 megabits per second over the 2.4 GHz band, for a total bandwidth of 1,750 megabits per second. Similarly, TP-Link represents that the router Mr. Walker purchased offers simultaneous wireless connections of 300 megabits per second, for a total bandwidth of 600 megabits per second. In particular, TP-Link represents that Mr. Walker's router offers a 300 Mbps wireless connection over the 2.4 GHz band, as well as a 300 Mbps wireless connection over the 5.0 GHz band.

2.   The claimed bandwidth is false. As Plaintiffs discovered after purchasing their Purported 802.11 Routers, neither of the two connections are capable of providing bandwidth at anywhere near the advertised speed. Rather, even under the best conditions, Mr. Gonzales's router offers only about 361 megabits per second over the 5 GHz band, and only about 70 megabits per second over the 2.4 GHz band, for a total of 431 megabits per second—less than 25% of

the advertised rate. Mr. Walker's router offers only about 123 megabits per second over the 5 GHz band—just 41% of the advertised rate.

3.      In fact, the Purported 802.11 Routers do not actually conform to the IEEE 802.11n and IEEE 802.11ac wireless standards. The routers—even when optimally configured—do not support the wireless data rates set forth in the standards. For example, the Purported 802.11ac Router that Mr. Gonzales purchased should be capable of offering a data rate of 1,300 megabits per second over the 5 GHz channel if it conformed to the standard, but instead the router offers only 361 megabits per second over that channel. Similarly, the Purported 802.11n Router that Mr. Walker purchased should be capable of offering a data rate of 300 megabits per second over the 5 GHz channel if it conformed to the standard, but instead the router offers only 123 megabits per second over that channel.

4.      TP-Link's misrepresentations are significant. Consumers shopping for wireless routers consider the speed of the wireless connection to be the most important aspect in the purchasing decision.

**Parties**

5.      Richard Gonzales is, and at all times alleged in this Class Action Complaint was, an individual and a resident of California. Mr. Gonzales currently resides in San Francisco, California.

6.      Matthew Walker is, and at all times alleged in this Class Action Complaint was, an individual and a resident of California. Mr. Walker currently resides in Montebello, California.

7.      Defendant TP-Link USA Corporation is a corporation incorporated under the laws of the state of California, having its principal place of business in Brea, California.

8.    Defendant TP-Link North America Inc. is a corporation incorporated under the laws of the state of California, having its principal place of business in Brea, California.

**Jurisdiction and Venue**

9.    This action is brought by Plaintiffs pursuant, *inter alia*, to the California Business and Professions Code, section 17200, et seq. Plaintiffs and Defendants are "persons" within the meaning of the California Business and Professions Code, section 17201.

10.    The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California.

11.    Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California, including in the City of Los Angeles and County of San Francisco.

12.    In accordance with California Civil Code Section 1780(d), Mr. Gonzales files herewith a declaration establishing that he resides in San Francisco, California, and that, while he was in San Francisco, California, he purchased the TP-Link product at issue using Amazon.com

13.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

**Substantive Allegations**

14.    The market for wireless routers is fiercely competitive. Router manufacturers continually attempt to gain market share by introducing the latest cutting-edge features that are attractive to consumers. Of all the features that router manufacturers offer, by far the most important to consumers is the speed, or "bandwidth," that the router offers. Accordingly, manufacturers prominently

advertise the bandwidth capabilities of their routers on their websites and product packaging.

### A. The IEEE 802.11n and IEEE 802.11ac Specifications and their Bandwidth Requirements

15.     The IEEE 802.11n standard was created by the Wireless LAN Working Group of the Institute of Electrical and Electronics Engineers LAN/MAN Standards Committee. The standard, which was published in 2009, was designed to increase the efficiency of wireless networking by enabling a single radio channel to support multiple data streams.

16.     Prior to the 802.11n standard, wireless transmitters and receivers operated as Single Input/Single Output (SISO) devices. This old technology, however, had a significant drawback: because the single wireless signal would be reflected off walls and other structures, the receiver would end up with multiple copies of the original signal. When these copies were out of sync with each other, the system would experience "multipath interference," whereby the copies of the signal would effectively cancel each other.

17.     The 802.11n standard was designed to mitigate multipath interference by using Multiple In, Multiple Out (MIMO) technology. This technology utilizes multiple transmitting and receiving antennas operating simultaneously. Each pair of antennas in a MIMO system is capable of transmitting its own independent data stream. Instead of having a single signal that can cancel itself out, MIMO can send a message using multiple signals, thereby diminishing multipath interference. Further, before a message is transmitted, the MIMO system can divide, or "multiplex" the message, which enables each portion of the message to be sent over a different antenna. These techniques substantially increase the bandwidth offered by prior technology.

18.    The 802.11n standard provides that routers using two spatial streams at 40 MHz can be configured to offer a data rate of up to 300 megabits per second. In order to do so, the router must utilize, among other things, 64-QAM modulation, a coding rate of 5/6, and a short guard interval (i.e., with a 400ns interval):

Table 20-34—MCS parameters for optional 40 MHz, $N_{SS}$ = 2, $N_{ES}$ = 1, EQM

| MCS Index | Modulation | R | $N_{BPSCS}(i_{SS})$ | $N_{SD}$ | $N_{SP}$ | $N_{CBPS}$ | $N_{DBPS}$ | Data rate (Mb/s) | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 800 ns GI | 400 ns GI |
| 8 | BPSK | 1/2 | 1 | 108 | 6 | 216 | 108 | 27.0 | 30.0 |
| 9 | QPSK | 1/2 | 2 | 108 | 6 | 432 | 216 | 54.0 | 60.0 |
| 10 | QPSK | 3/4 | 2 | 108 | 6 | 432 | 324 | 81.0 | 90.0 |
| 11 | 16-QAM | 1/2 | 4 | 108 | 6 | 864 | 432 | 108.0 | 120.0 |
| 12 | 16-QAM | 3/4 | 4 | 108 | 6 | 864 | 648 | 162.0 | 180.0 |
| 13 | 64-QAM | 2/3 | 6 | 108 | 6 | 1296 | 864 | 216.0 | 240.0 |
| 14 | 64-QAM | 3/4 | 6 | 108 | 6 | 1296 | 972 | 243.0 | 270.0 |
| 15 | 64-QAM | 5/6 | 6 | 108 | 6 | 1296 | 1080 | 270.0 | 300.0 |

(802.11n specification (2009) at 348.)

19.    The 802.11ac standard, which was published in 2013, builds on the technology of the 802.11n standard. Unlike the 802.11n standard, which supports a maximum of four antennas, the 802.11ac standard supports an increased number of spatial streams, greater channel width, and more efficient modulation, resulting in an increase in bandwidth.

**B. TP-Link's Purported 802.11 Routers**

20.    TP-Link has marketed and sold dozens of wireless routers that purportedly conform to the 802.11n and/or 802.11ac standard. Current models include, without limitation, the Archer C5400, Archer C4000, Archer C3150 V2, Archer C2300, Archer AC1900, Archer A7, Archer C8, Archer C7, Archer C9, Archer C1200, Archer C69, Touch P5, Archer C20, Archer C50, TGR1900, Archer C900, TL-WR902AC, TL-WR1043N, TL-WR940N, TL-WR802N, TL-WR841N, Archer C5200, Archer C3000, and the Archer A2300.

21.    For each of these models, TP-Link provides specifications on its website claiming that the router conforms to the IEEE 802.11n and/or IEEE 802.11ac standard. The specifications further set forth the wireless data rate that the router supposedly offers.

22.    A typical example of such a representation, which Mr. Gonzales saw for the router he purchased, is as follows:

| WIRELESS FEATURES | |
| --- | --- |
| Wireless Standards | IEEE 802.11ac/n/a 5GHz<br>IEEE 802.11b/g/n 2.4GHz |
| Frequency | 2.4GHz and 5GHz |
| Signal Rate | 5GHz: Up to 1300Mbps<br>2.4GHz: Up to 450Mbps |

(https://www.tp-link.com/us/products/details/cat-9_Archer-C7.html#specifications, retrieved on August 6, 2018.)

23.    Another example of such a representation, which Mr. Walker saw for the router he purchased, is as follows:

| WIRELESS FEATURES | |
| --- | --- |
| Wireless Standards | IEEE 802.11a, IEEE 802.11b, IEEE 802.11g, IEEE 802.11n |
| Frequency | 2.4GHz & 5GHz |
| Signal Rate | 5GHz: Up to 300Mbps<br>2.4GHz: Up to 300Mbps |

(https://www.tp-link.com/us/products/details/cat-9_TL-WDR3600.html#specifications, retrieved on June 26, 2018.)

24.    TP-Link boasts that this "signal rate" is equivalent to the routers' "speed." For example, the primary webpage for the router Mr. Gonzales purchased states that it has "1300Mbps wireless speeds over the crystal clear 5GHz band and 450Mbps over the 2.4GHz band." (*See* https://www.tp-link.com/us/products/details/cat-9_Archer-C7.html) Similarly, the primary

webpage for the router Mr. Walker purchased provides the following comparison

chart:



(https://www.tp-link.com/us/products/details/cat-9_TL-WDR3600.html, retrieved

on June 26, 2018.)

25.    As set forth below (*inter alia*, *see infra*, ¶¶ 30-35, 43-49), Plaintiffs saw

these representations prior to making their purchases, and relied on them in

making their purchases.

26.    TP-Link sells the Purported 802.11 Routers through various retailers,

including both brick-and-mortar retailers and online retailers.

27.    To promote the sale of the Purported 802.11 Routers, TP-Link provides

to all such retailers information relating to the routers. TP-Link represents to all

its retailers that the Purported 802.11 Routers conform to the IEEE 802.11n and/or

IEEE 802.11ac standards, and that they support wireless data rates in accordance

with those standards.

28.    TP-Link makes these statements and representations to retailers with

the knowledge and intent that the retailers will present this information to

consumers.

29.   At no time did TP-Link inform consumers or its retailers that the Purported 802.11 Routers are incapable of achieving the advertised wireless data rates.

### C. Plaintiffs' Purchases of the Purported 802.11 Routers and Discovery of their Inability to Achieve the Advertised Data Rates

#### 1.   Mr. Gonzales' Experience

30.   In the spring of 2016, Mr. Gonzales was shopping for a new wireless router. He was specifically looking for a router could transfer data at a high rate of speed. Mr. Gonzales researched his options using a variety of resources available on the Internet, including TP-Link's website.

31.   One of the routers advertised on TP-Link's website was the Archer C7 AC1750 Wireless Dual Band Gigabit Router. Mr. Gonzales saw the representation on TP-Link's website that the router conformed to the 802.11ac standard and that it offered "[s]imultaneous 2.4GHz 450Mbps and 5GHz 1300Mbps connections for 1.75Gbps of total available bandwidth." He also saw the representation on the website that "[w]ith 1300Mbps wireless speeds over the crystal clear 5GHz band and 450Mbps over the 2.4GHz band, the Archer C7 is the superior choice for seamless HD streaming, online gaming and other bandwidth-intensive tasks."

32.   Before purchasing the product from Amazon.com, Mr. Gonzales also reviewed and relied on representations on Amazon.com that originated from TP-Link regarding the wireless data speed of the router. For example, the Amazon.com page for the router stated that the "Dual band router upgrades to 1750 Mbps high speed internet (450Mbps for 2.4GHz + 1300Mbps for 5GHz), reducing buffering and ideal for 4K stream."

33.   The back of the packaging further represents that the "speed" of the router is 450 Mbps on the 2.4 GHz band, and 1,300 Mbps on the 5 GHz band:

| | STANDARDS | SPEED |
|---|---|---|
| **AC1750** Archer C8 | IEEE 802.11 ac/n/g/b/a | 2.4GHz: 450Mbps 5GHz: 1300Mbps |
| **AC1750** Archer C7 | IEEE 802.11 ac/n/g/b/a | 2.4GHz: 450Mbps 5GHz: 1300Mbps |

**IEEE 802.11ac Wireless Technology**

TP-LINK's Archer C7 comes with the next generation Wi-Fi standard – 802.11ac, backward compatible with 802.11n devices, 3 times faster than wireless N speeds and delivers a combined wireless data transfer rate of up to 1.75Gbps. With 450Mbps wireless speeds over the 2.4GHz band and 1300Mbps over the crystal-clear 5GHz band, the Archer C7 is the superior choice for seamless HD streaming, online gaming and other bandwidth-intensive tasks.

34.     The wireless speed of the router was important to Mr. Gonzales because he intended to transfer large amounts of data using the router.

35.     In reliance on Defendants' representations, Mr. Gonzales purchased the router, in April 2016, from Amazon.com.

36.     After purchasing and using the router, Mr. Gonzales discovered that the router is incapable of achieving the advertised speeds, regardless of whether the 2.4 GHz band or the 5.0 GHz band is used.

37.     In December 2015, Tom's Guide published a review of the same TP-Link model that Mr. Gonzales purchased (i.e., the TP-Link Archer C7 AC1750 Wireless Dual Band Gigabit Router). As part of the review, the author tested router's wireless data rate over the 5 GHz band, using a sophisticated network software package. Despite the fact that the router was placed at a distance of only five feet from the source, the router's peak speed at 5 GHz was only 360.6 megabits per second. (*See* https://www.tomsguide.com/us/tp-link-archer-c7-router,review-3289.html.)

38.     Subsequently, Mr. Gonzales' investigator tested the same TP-Link model. That testing corroborated the results obtained by Tom's Guide, and further established that that the router is incapable of achieving the wireless data rates

advertised by TP-Link and set forth in the IEEE 802.11ac standard. In particular, the top speed at 5 GHz was even less than the speed observed by Tom's Guide. Mr. Gonzales's investigator further observed that the router offered only about 70 megabits per second over the 2.4 GHz band. This testing was performed on the TP-Link router under circumstances that were most favorable to the router. Accordingly, the investigator's tests show how the router operates in the best-case scenario. Consumers using the router under real-world conditions would generally have significantly worse performance.

39.   Had Mr. Gonzales known that the TP-Link router's wireless data rate was so slow, or that it was not compliance with the IEEE 802.11ac specification, he would not have paid as much for the router, or would have purchased a different wireless router.

40.   As a result of TP-Link's misrepresentations, Mr. Gonzales has sustained an out of pocket loss in, at a minimum, the difference in price between a router capable of transferring data at the advertised rates, and routers that are not capable of doing so, which could be established using regression techniques such as hedonic regression to analyze market prices of various laptop computers advertised as being capable and/or not being capable of transferring data at the advertised rates and/or survey techniques such as conjoint analysis.

41.   Mr. Gonzales intends to purchase TP-Link routers in the future and specifically wishes to purchase a TP-Link router that is capable of achieving the 1,750 megabits per second rate, so that he can benefit from the higher transfer speeds.  He therefore is likely to be deceived again by any misrepresentations with respect to the data rates of such TP-Link routers. Mr. Gonzales will be unable to determine whether such representations are false without purchasing and testing such TP-Link routers.

42.     Before TP-Link released its Purported 802.11ac Routers, it tested their wireless data rates, and was aware of the rates of which they were capable. TP-Link—one of the world's largest manufacturers of wireless routers—would not release a product without first testing its wireless data rates. Accordingly, TP-Link knew that the Purported 802.11ac Routers did not comply with the IEEE 802.11ac standard, and that they were incapable of achieving speeds anywhere near the required speeds that TP-Link advertised.

**2.  Mr. Walker's Experience**

43.     In the spring of 2015, Mr. Walker was shopping for a new wireless router. He was specifically looking for a router could transfer data at a high rate of speed. Mr. Walker researched his options using a variety of resources available on the Internet, including TP-Link's website.

44.     One of the routers advertised on TP-Link's website was the N600 Wireless Dual Band Gigabit Router, model number TL-WDR3600. Mr. Walker saw the representation on TP-Link's website that the router conformed to the 802.11n standard and that it offered "[s]imultaneous 2.4GHz 300Mbps and 5GHz 300 Mbps connections for 600Mbps of total available bandwidth." He also saw the representation that "[u]sers can run day-to-day applications, such as e-mail and web browsing over the 2.4GHz band at 300Mbps while using bandwidth intensive or latency sensitive applications, such as streaming HD video or playing online games, over the clearer 5GHz band at 300Mbps, at the same time." He further saw the comparison chart stating that the "[s]peed" of the router was 300Mbps at 2.4GHz, and 300 Mbps at 5GHz.

45.     Before purchasing the product from Amazon.com, Mr. Walker also reviewed and relied on representations on Amazon.com that originated from TP-Link regarding the wireless data speed of the router. For example, the Amazon.com page for the router stated:

> TP-LINKs TL-WDR3600 is a performance optimized
> simultaneous dual band wireless router combining the blazing
> fast speeds of 300Mbps using the crystal clear 5GHz band and
> 300Mbps using the traditional 2.4GHz band. With simultaneous
> dual band, users have 600Mbps of total bandwidth to power
> numerous bandwidth intensive applications at the same time
> around a large home or office setting, where simple tasks such
> as e-mail or web browsing can be handled by the 2.4GHz band
> at 300Mbps and more latency sensitive tasks such as online
> gaming or HD video streaming can be processed over the 5GHz
> band at 300Mbps, at the same time.

46.   Mr. Walker further saw the product packaging, which was clearly depicted on Amazon.com. The front of the packaging contains the following statement, which appears in large, prominently displayed letters:



47.   The back of the packaging further represents that the "speed" of the router is 300 Mbps on both the 2.4 GHz band and the 5 GHz band:



48.   The wireless speed of the router was important to Mr. Walker because he intended to transfer large amounts of data using the router.

49.     In reliance on Defendants' representations, Mr. Walker purchased the router, in April 2015, from Amazon.com.

50.     Mr. Walker later discovered that the router is incapable of achieving the advertised 300 Mbps speed. The router is incapable of achieving that speed regardless of whether the 2.4 GHz band or the 5.0 GHz band is used.

51.     In June 2018, Mr. Walker's investigator obtained the same model of router that Mr. Walker had purchased (i.e., the TP-Link N600 Wireless Dual Band Gigabit Router, model number TL-WDR3600), for the purposes of testing the router's wireless data rate. The testing confirmed that the router is incapable of achieving the wireless data rates advertised by TP-Link and set forth in the IEEE 802.11n standard. In particular, the testing confirmed that the 5 GHz band (which, according to TP-Link's own statement on the router's packaging, is "clearer" than the 2.4 GHz band, and is more appropriate for "bandwidth intensive or latency sensitive applications, such as streaming HD video or playing online games"), can transfer data at only 123 Megabits/second—only 41% as fast as the 300 megabit/second speed required by the 802.11n standard and advertised by TP-Link for the router.

52.     The testing was performed on the TP-Link router under circumstances that were most favorable to the router. Accordingly, the investigator's tests show how the router operates in the best-case scenario. Consumers using the router under real-world conditions would generally have significantly worse performance.

53.     Had Mr. Walker known that the TP-Link router's wireless data rate was so slow, or that it was not compliance with the IEEE 802.11n specification, he would not have paid as much for the router, or would have purchased a different wireless router.

54.   As a result of TP-Link's misrepresentations, Mr. Walker has sustained an out of pocket loss in, at a minimum, the difference in price between a router capable of transferring data at the advertised rates, and routers that are not capable of doing so, which could be established using regression techniques such as hedonic regression to analyze market prices of various laptop computers advertised as being capable and/or not being capable of transferring data at the advertised rates and/or survey techniques such as conjoint analysis.

55.   Mr. Walker intends to purchase TP-Link routers in the future and specifically wishes to purchase a TP-Link router that is capable of achieving the 300 megabits per second rate, so that he can benefit from the higher transfer speeds. He therefore is likely to be deceived again by any misrepresentations with respect to the data rates of such TP-Link routers. Mr. Walker will be unable to determine whether such representations are false without purchasing and testing such TP-Link routers.

56.   Before TP-Link released its Purported 802.11n Routers, it tested their wireless data rates, and was aware of the rates of which they were capable. TP-Link—one of the world's largest manufacturers of wireless routers—would not release a product without first testing its wireless data rates. Accordingly, TP-Link knew that the Purported 802.11n Routers did not comply with the IEEE 802.11n standard, and that they were incapable of achieving speeds anywhere near the required speeds that TP-Link advertised.

**Class Allegations**

57.   In addition to their individual claims, Plaintiffs bring this action pursuant to section 382 of the California Code of Civil Procedure and section 1781 of the California Civil Code on behalf of a Class consisting of all persons,

natural or otherwise, who, while residing in California, purchased a Purported 802.11 Router.

58.   Excluded from the Class are TP-Link, its affiliates, successors and assigns, officers and directors, and members of their immediate families.

59.   The proposed Class is so numerous that joinder of all members is impracticable. The precise number of members in the Class is not yet known to Plaintiffs, but they estimate that it is well in excess of 1,000 people.

60.   There are questions of law and fact that are common to the Class, including, but not limited to, the following:

- whether the Purported 802.11 Routers are capable of achieving the wireless data rates advertised by TP-Link;

- whether the Purported 802.11 Routers are capable of achieving the wireless data rates required by the IEEE 802.11n and IEEE 802.11ac standards;

- whether TP-Link misled class members by representing that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates;

- whether TP-Link misled class members by representing that the Purported 802.11 Routers are capable of achieving the wireless data rates required by the 802.11n and 802.11ac standards;

- whether the Purported 802.11 Routers actually conform to the IEEE 802.11n and 802.11ac standards;

- whether TP-Link breached its obligations to the class;

- whether TP-Link engaged in the alleged conduct knowingly, recklessly, or negligently;

- the amount of revenues and profits TP-Link received and/or the amount of monies or other obligations lost by class members as a result of such wrongdoing;

- whether class members are entitled to injunctive relief and other equitable relief and, if so, what is the nature of such relief; and

- whether class members are entitled to payment of actual, incidental, consequential, exemplary, and/or statutory damages plus interest, and if so, what is the nature of such relief.

61.    Plaintiffs' claims against TP-Link are typical of the claims of the Class because Plaintiffs and all other members of the class purchased a Purported 802.11 Router with the same advertising and web-based representations and documentation. With respect to the class allegations, Plaintiffs were subject to the exact same business practices and written representations.

62.    Plaintiffs will fairly and adequately protect the interests of the Class.

63.    Plaintiffs have demonstrated their commitment to the case, have diligently educated themselves as to the issues involved, and to the best of their knowledge do not have any interests adverse to the proposed class.

64.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members.

65.    A class action is superior to other available methods for a fair and efficient adjudication of this controversy as many members of the proposed class have damages arising from TP-Link's wrongful course of conduct which would not be susceptible to individualized litigation of this kind, including, but not limited to, the costs of experts and resources that may be required to examine the business practices in question.

66.    Given the relative size of damages sustained by the individual members of the Class, the diffuse impact of the damages, and homogeneity of the issues, the interests of members of the Class individually controlling the prosecution of separate actions is minimal.

67.    There is no litigation already commenced, nor is there anticipated to be subsequent litigation commenced by other members of the Class concerning TP-Link's alleged conduct. Consequently, concerns with respect to the maintenance

of a class action regarding the extent and nature of any litigation already commenced by members of the Class are non-existent.

68.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this Class Action Complaint that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### Plaintiff's First Cause of Action
### (Fraud, Deceit and/or Misrepresentation)
### On Behalf of Plaintiff Gonzales and the Class

69.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein.

70.    As set forth above (*inter alia, see supra*, ¶¶ 20-42), TP-Link represented to Plaintiff Gonzales and those similarly situated that the Purported 802.11 Routers are capable of achieving specific wireless data rates such as 1,300 megabits per second on the 5 GHz band and 450 megabits per second on the 2.4 GHz band, in the case of the router he purchased.). TP-Link provided specifications on its website stating that the Purported 802.11 Routers are capable of achieving these wireless data rates. TP-Link also represented that the Purported 802.11 Routers comply with the IEEE 802.11n and/or IEEE 802.11ac standard.

71.    TP-Link further concealed, suppressed, and omitted material facts that would have revealed that the Purported 802.11 Routers are not, in fact, capable of the advertised wireless data rates, on either the 2.4 GHz band or the 5.0 GHz band, and that the Purported 802.11 Routers do not, in fact, comply with the IEEE 802.11n or 802.11ac standard.

72.    In addition, TP-Link represented to all retailers of the Purported 802.11 Routers, including online retailers and brick-and-mortar retailers (such as Amazon.com), that the Purported 802.11 Routers are capable of achieving

specific wireless data rates (such as 1,300 megabits per second on the 5 GHz band and 450 megabits per second on the 2.4 GHz band, in the case of the router Mr. Gonzales purchased), and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or 802.11ac standard. TP-Link made these representations by providing to such retailers specifications of the Purported 802.11 Routers, stating that the Purported 802.11 Routers are capable of the specific wireless data rates, and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or IEEE 802.11ac standard. TP-Link further concealed, suppressed, and omitted material facts from such retailers that would have revealed that the Purported 802.11 Routers are not, in fact, capable of the specific wireless data rates, on either the 2.4 GHz band or the 5.0 GHz band, and that the Purported 802.11 Routers do not, in fact, comply with the IEEE 802.11n or 802.11ac standard.

73. TP-Link made these representations to retailers with the knowledge and intent that the retailers (such as Amazon.com) would represent to Plaintiff, and others similarly situated, that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates, and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or IEEE 802.11ac standard.

74. TP-Link's representations—both those made directly to consumers on TP-Link's website and on the product, and those made indirectly to consumers through retailers—were false, and TP-Link knew that the representations were false when it made them. In particular, as described above (*supra*, ¶ 42), TP-Link tested the wireless data rates of its Purported 802.11 Routers, and confirmed that the routers were incapable of achieving rates anywhere near the advertised speeds or the speed required by the IEEE 802.11n and 802.11ac standards and advertised by TP-Link.

75. TP-Link's misrepresentations and omissions were material at the time they were made. TP-Link concerned material facts that were essential to the

analysis undertaken by Plaintiff and those similarly situated as to whether to purchase the Purported 802.11 Routers offered the advertised wireless data rates and conformed to the IEEE 802.11n and/or 802.11 ac standard.

76.   Plaintiff and those similarly situated reasonably relied to their detriment on TP-Link's representations—both those that TP-Link made directly to them, and those that TP-Link made indirectly to them through retailers. Specifically, Plaintiff and those similarly situated purchased Purported 802.11 Routers because he believed that they were capable of achieving the advertised data transfer rates, and because they believed the routers conformed to the IEEE 802.11n and/or IEEE 802.11ac standard. This reliance was reasonable because Plaintiff and those similarly situated could not test, prior to purchasing the routers, whether the routers were capable of achieving the advertised wireless data rates.

77.   Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by TP-Link, he would have acted differently by, without limitation, not purchasing (or paying less for) the Purported 802.11 Routers.

78.   TP-Link had a duty to inform members of the Class at the time of their purchase that the Purported 802.11 Routers were incapable of the advertised data rates, and that they did not comply with the IEEE 802.11n or 802.11ac standard. In making its representations and omissions, TP-Link breached its duty to class members. TP-Link also gained financially from, and as a result of, its breach.

79.   By and through such fraud, deceit, misrepresentations and/or omissions, TP-Link intended to induce Plaintiff and those similarly situated to alter their position to their detriment. Specifically, TP-Link fraudulently and deceptively induced Plaintiff and those similarly situated to, without limitation, purchase the Purported 802.11 Routers.

80.   As a direct and proximate result of TP-Link's misrepresentations and omissions, Plaintiff and those similarly situated have suffered damages. In particular, Plaintiff seeks to recover on behalf of himself and those similarly situated the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Purported 802.11 Routers and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

81.   TP-Link's conduct as described herein was willful and malicious and was designed to maximize TP-Link's profits even though TP-Link knew that it would cause loss and harm to Plaintiff and those similarly situated.

**Plaintiff's Second Cause of Action**
**(Violation of the Consumers Legal Remedies Act,**
**California Civil Code § 1750, et seq.)**
**On Behalf of Plaintiff Gonzales and the Class**

82.   Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

83.   This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, et seq. ("CLRA").

84.   TP-Link's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale of goods to consumers.

85.   Plaintiff and other members of the class are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

86.   The products that Plaintiff and similarly situated members of the class purchased from TP-Link are "goods" within the meaning of California Civil Code § 1761.

87.   By engaging in the actions, representations, and conduct set forth in this Class Action Complaint, TP-Link has violated, and continue to violate, §§ 1770(a)(2), 1770(a)(3), 1770(a)(4), 1770(a)(5), 1770(a)(7), and 1770(a)(9) of the CLRA. In violation of California Civil Code §1770(a)(2), TP-Link misrepresented the approval or certification of goods. In violation of California Civil Code §1770(a)(3), TP-Link misrepresented the certification by another. In violation of California Civil Code §1770(a)(4), TP-Link used deceptive representations in connection with goods. In violation of California Civil Code §1770(a)(5), TP-Link represented that goods have approval, characteristics, uses, benefits, and qualities that they do not have. In violation of California Civil Code §1770(a)(7), TP-Link's acts and practices constitute improper representations that the goods and/or services it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(9), TP-Link advertised goods with intent not to sell them as advertised.

88.   Specifically, TP-Link's acts and practices lead consumers, including Mr. Gonzales, to believe that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates, and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or IEEE 802.11ac standard.

89.   To the contrary, the Purported 802.11 Routers are incapable of achieving the advertised wireless data rates, and do not comply with the IEEE 802.11n or 802.11ac standard.

90.   Plaintiff requests that this Court enjoin TP-Link from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If TP-Link is not restrained from engaging in these types of practices in the future, Plaintiff and other members of the class will continue to suffer harm.

91.     CLRA § 1782 NOTICE. **Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiff specifically disclaims, at this time, any request for damages under any provision of the CLRA.** Plaintiff, however, hereby provides TP-Link with notice and demand that within thirty (30) days from that date, TP-Link correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. TP-Link's failure to do so will result in Plaintiff Gonzales amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of themselves and those similarly situated members of the Class, compensatory damages, punitive damages and restitution of any ill-gotten gains due to TP-Link's acts and practices.

92.     Plaintiff also requests that this Court award him costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

**Plaintiff's Third Cause of Action**
**(False Advertising, Business and Professions Code § 17500, et seq. ("FAL"))**
**On Behalf of Plaintiff Gonzales and the Class**

93.     Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

94.     Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, TP-Link has made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Purported 802.11 Routers.

95.     TP-Link has made representations and statements (by omission and commission) that lead reasonable consumers to believe that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates, and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or IEEE 802.11ac standard. TP-Link, however, deceptively failed to inform consumers that (i) the Purported 802.11 Routers are incapable of achieving the advertised wireless data

rates; and (ii) the Purported 802.11 Routers do not comply with the IEEE 802.11n and/or the IEEE 802.11ac standard.

96.   Plaintiff and those similarly situated relied to their detriment on TP-Link's false, misleading and deceptive advertising and marketing practices. Had Plaintiff and those similarly situated been adequately informed and not intentionally deceived by TP-Link, he would have acted differently by, without limitation, paying less for the Purported 802.11 Routers or purchasing a different router.

97.   TP-Link's acts and omissions are likely to deceive the general public.

98.   TP-Link engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, TP-Link has engaged in false advertising, as defined and prohibited by section 17500, et seq. of the California Business and Professions Code.

99.   The aforementioned practices, which TP-Link as used, and continues to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over TP-Link's competitors as well as injury to the general public.

100.  Plaintiff seeks, on behalf of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by TP-Link from Plaintiff, the general public, or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

101.  Plaintiff seeks, on behalf of those similarly situated, an injunction to prohibit TP-Link from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein. The acts complained of herein occurred, at least in part, within three (3) years preceding the filing of this Class Action Complaint.

102.  Plaintiff and those similarly situated are further entitled to and do seek both a declaration that the above-described practices constitute false, misleading and deceptive advertising, and injunctive relief restraining TP-Link from engaging in any such advertising and marketing practices in the future. Such misconduct by TP-Link, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that TP-Link will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future customers to repeatedly and continuously seek legal redress in order to recover monies paid to TP-Link to which TP-Link is not entitled. Plaintiff, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

103.  As a direct and proximate result of such actions, TP-Link and the other members of the Class have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

### Plaintiff's Fourth Cause of Action
### (Negligent Misrepresentation)
### On Behalf of Plaintiff Gonzales and the Class

104.  Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

105.  In selling its Purported 802.11 Routers to consumers, TP-Link made false and misleading statements that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates, and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or 802.11ac standard. TP-Link, however,

deceptively failed to inform consumers that (i) the Purported 802.11 Routers are incapable of achieving the advertised wireless data rates; and (ii) the Purported 802.11 Routers do not comply with the IEEE 802.11n and/or IEEE 802.11ac standard.

106.  These representations were material at the time they were made. They concerned material facts that were essential to the decision of Plaintiff and those similarly situated regarding how much to pay for the Purported 802.11 Routers.

107.  TP-Link made identical misrepresentations and omissions to members of the Class regarding the Purported 802.11 Routers.

108.  TP-Link should have known its representations to be false, and had no reasonable grounds for believing them to be true when they were made.

109.  By and through such negligent misrepresentations, TP-Link intended to induce Plaintiff and those similarly situated to alter their position to their detriment. Specifically, TP-Link negligently induced Plaintiff and those similarly situated, without limitation, to purchase the Purported 802.11 Routers at the price they paid.

110.  Plaintiff and those similarly situated reasonably relied on TP-Link's representation. Specifically, Plaintiff and those similarly situated paid as much as they did for the Purported 802.11 Routers, because TP-Link had represented that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates, and that the Purported 802.11 Routers comply with the IEEE 802.11n and/or 802.11ac standard.

111.  Because they reasonably relied on TP-Link's false representations, Plaintiff and those similarly situated were harmed in the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Purported 802.11 Routers and the price they would have paid but for Defendants'

misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

## Plaintiffs' Fifth Cause of Action
### (Unjust Enrichment)
### On Behalf of Plaintiff Gonzales and the Class

112.  Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

113.  By means of Defendants' wrongful conduct alleged herein, Defendants knowingly sold Purported 802.11 Routers to Plaintiff and members of the Classes in a manner that was unfair, unconscionable, and oppressive.

114.  Defendants knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Classes. In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Classes.

115.  As a result of Defendants 'wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Classes.

116.  Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

117.  Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits it received, without justification, from selling Purported 802.11 Routers to Plaintiff and members of the Classes in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

118.  The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Classes. Defendants should be compelled to return in a common fund for the benefit of Plaintiff and members of the Classes all wrongful or inequitable proceeds received by them.

119.  Plaintiff and members of the Classes have no adequate remedy at law.

**Plaintiffs' Sixth Cause of Action**
**(Unfair, Unlawful and/or Deceptive Trade Practices,**
**Business and Professions Code § 17200, et seq.)**
**On Behalf of Themselves and the Class**

120.  Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

121.  Within four (4) years preceding the filing of this Class Action Complaint, and at all times mentioned herein, TP-Link has engaged, and continues to engage, in unfair, unlawful and deceptive trade practices in California by carrying out the unfair, deceptive and unlawful business practices outlined in this Class Action Complaint. In particular, TP-Link has engaged, and continues to engage, in unfair, unlawful and deceptive trade practices by, without limitation, the following:

a. falsely and deceptively representing to Plaintiffs, and those similarly situated, that the Purported 802.11 Routers are capable of achieving the advertised wireless data rates;

b. falsely and deceptively representing to Plaintiffs, and those similarly situated, that the Purported 802.11 Routers comply with the IEEE 802.11n and/or 802.11ac standard;

c. failing to inform Plaintiffs, and those similarly situated, that the Purported 802.11 Routers are incapable of achieving the advertised wireless data rates;

d. failing to inform Plaintiffs, and those similarly situated, that the Purported 802.11 Routers do not comply with the IEEE 802.11n and/or 802.11ac standard;

e. engaging in misrepresentation as described herein;

f. violating the CLRA as described herein; and

g. violating the FAL as described herein.

122.  Plaintiffs and those similarly situated relied to their detriment on TP-Link's unfair, deceptive and unlawful business practices. Had Plaintiffs and those similarly situated been adequately informed and not deceived by TP-Link, they would have acted differently by, without limitation, paying less for the Purported 802.11 Routers.

123.  TP-Link's acts and omissions are likely to deceive the general public.

124.  TP-Link engaged in these unfair practices to increase its profits. Accordingly, TP-Link has engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code.

125.  The aforementioned practices, which TP-Link has used to its significant financial gain, also constitute unlawful competition and provides an unlawful advantage over TP-Link's competitors as well as injury to the general public.

126.  As a direct and proximate result of such actions, Plaintiffs and the other members of the Class have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. Among other things, Plaintiffs and the class lost the amount of the price premium they paid (i.e., the difference between the price consumers paid for the Purported 802.11

Routers and the price they would have paid but for TP-Link's misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis.

127.  Plaintiffs seek, on behalf of those similarly situated, a declaration that the above-described trade practices are fraudulent and unlawful.

128.  Plaintiffs seek, on behalf of those similarly situated, an injunction to prohibit TP-Link from offering the Purported 802.11 Routers within a reasonable time after entry of judgment, unless the TP-Link modifies its website and other marketing materials to remove the misrepresentations and to disclose the omitted facts. Such misconduct by TP-Link, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to TP-Link to which TP-Link was not entitled. Plaintiffs, those similarly situated and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## Prayer for Relief

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  On Cause of Action Number 1 against Defendants and in favor of
    Plaintiff Gonzales and the other members of the Class:

    1.  An award of compensatory damages in the amount of the price
        premium paid (i.e., the difference between the price consumers paid
        for the Purported 802.11 Routers and the price they would have paid

but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis; and

    2.   An award of punitive damages, the amount of which is to be determined at trial.

B.  On Cause of Action Number 2 against Defendants and in favor of Plaintiff Gonzales and the other members of the Class:

    1.   For restitution of the price premium paid (i.e., the difference between the price consumers paid for the Purported 802.11 Routers and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis;

    2.   for injunctive relief pursuant to California Civil Code section 1780;

    3.   [Reserved]; and

    4.   [Reserved].

C.  On Cause of Action Number 3 against Defendants and in favor of Plaintiff Gonzales and the other members of the Class:

    1.   For restitution of the price premium paid (i.e., the difference between the price consumers paid for the Purported 802.11 Routers and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis, pursuant to, without limitation, the California Business & Professions Code §§ 17200, et seq. and 17500, et seq.;

and

2. for declaratory and injunctive relief pursuant to, without limitation, the California Business & Professions Code §§ 17200, et seq. and 17500, et seq; and

D. On Causes of Action Number 4 and 5 against Defendants and in favor of Plaintiff Gonzales and the other members of the Class:

1. For the greater of actual or compensatory damages according to proof;

E. On Cause of Action Number 6 against Defendants and in favor of Plaintiffs and the other members of the Class:

1. For restitution of the price premium paid (i.e., the difference between the price consumers paid for the Purported 802.11 Routers and the price they would have paid but for Defendants' misrepresentations), in an amount to be proven at trial using econometric or statistical techniques such as hedonic regression or conjoint analysis, pursuant to, without limitation, the California Business & Professions Code §§ 17200, et seq.; and

2. for declaratory and injunctive relief pursuant to, without limitation, the California Business & Professions Code §§ 17200, et seq.

**Jury Trial Demanded**

Plaintiffs demand a trial by jury.


Respectfully submitted,

Dated: August 15, 2018        **GUTRIDE SAFIER LLP**


Adam J. Gutride, Esq.
Seth A. Safier, Esq.
Todd Kennedy, Esq.
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 789-6390
Facsimile: (415) 449-6469

Attorneys for Plaintiffs